## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN

ALPHONSO MITCHELL CLARK, #506485
ST. LOUIS CORRECTIONAL FACILITY
8585 N. Croswell Road
St. Louis, MI  48880
                Petitioner

                                   Case No. 2009-CV-13088
v.                                Hon. LUDINGTON
                                   Hon. Magistrate:  MORGAN
NICK J. LUDWICK, *WARDEN*,
                Respondent

_____/

| | |
|---|---|
| LAW OFFICES OF DAVID S. STEINGOLD | ATTORNEY GENERAL OF MICHIGAN |
| BY:  DAVID S. STEINGOLD (P 29752) | BY: |
| Attorney for Petitioner | Attorney for Respondent |
| 400 Monroe Street, Ste. 280 | 300 S. Washington, Ste. 530 |
| Detroit, MI  48226 | Lansing, MI 48913 |
| (313) 962-0000  (voice) | (517) 335-1488 |
| (313) 962-0766  (fax) | |
| detroitdefender@yahoo.com | |

_____/

### AMENDED PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. §2254

      NOW COMES Petitioner, ALPHONSO MITCHELL CLARK, #506485, by and through

his attorney, DAVID S. STEINGOLD (P 29752), and for his Amended Petition for Writ of

Habeas Corpus by a Person in State Custody, pursuant to 28 U.S.C. § 2254, submits the

following allegations of fact:

      1.      The conviction under attack was entered by the Third Circuit Court, Frank

Murphy Hall of Justice, 1441 St. Antoine, Detroit, MI 48226; Wayne County, Michigan by

Judge Daniel Ryan.  Wayne County Circuit Court Case No. 2005-513890-01.

2.        Petitioner's conviction was entered on:  <u>12/06/2005</u>.  Petitioner was convicted by jury of the following:  <u>Count I</u>:  Homicide First Degree (MCL §750.316); <u>Count II</u>: Possession of Firearm by a Felon (MCL § 750.224f), and <u>Count III</u>: Felony Firearm (MCLA §750.227b).

3.        Petitioner was sentenced on <u>12/06/05</u>, to serve a period of incarceration of:  <u>Count I</u>: mandatory life without parole;  <u>Count II</u>: one to seven and a half years; and <u>Count III</u>: two years consecutive.

4.        Petitioner was convicted of more than one (1) crime in the conviction currently under collateral attack.

5.        Petitioner was originally charged with: <u>Count I</u>:  Homicide First Degree (MCL §750.316); <u>Count II</u>: Possession of Firearm by a Felon (MCL § 750.224f), and <u>Count III</u>: Felony Firearm (MCLA §750.227b).

6.        Petitioner pled <u>not guilty</u> to all of the original charges.

7.        A trial by Jury was held on all counts.

8.        Petitioner <u>did</u> testify at trial in his own defense.

9.        Petitioner <u>did</u> appeal the judgment of conviction as of right, raising five (5) issues in the <u>Michigan Court of Appeals, COA Docket No. 267188</u>.  Petitioner raised the following issues in his appeal of right:

**I.        Whether the great weight of the evidence presented was insufficient to establish beyond a reasonable doubt that the defendant/Appellant Alphonso Mitchell Clark was guilty of murder in the first degree?**

**II.        Whether the trial court erred when it permitted the prosecutor to continue to play the 9-1-1 tape where the probative value was outweighed by the prejudicial effect which evoked a heightened emotional and sympathetic response from the jury?**

2

**III. Whether the prosecutor committed prosecutorial misconduct when he continued to infuse and elicit testimony regarding a suspected drug transaction where there was no evidence or testimony to support such a theory?**

**IV. Whether the trial court erred when it gave the lying in wait instruction over the defense objection, where there was no factual basis to give such an instruction?**

**V. Whether the court erred by denying the defense motion for a mistrial where the jury continued to assert the where deadlocked and where the court put undue pressure on the jury to reach a verdict?**

10.     The Michigan Court of Appeals affirmed Petitioner's convictions on <u>05-31-07</u>. The Michigan Court of Appeals Opinion and Order is attached as **Exhibit A**.

11.     Petitioner then appealed the decision of the Michigan Court of Appeals by Application for Leave to Appeal to the <u>Michigan Supreme Court, Docket No. 134423</u>. Petitioner raised the same five (5) issues to the Michigan Supreme Court.

12.     The Michigan Supreme Court denied leave to appeal on <u>09/24/2007</u>. The Michigan Supreme Court Order denying leave to appeal is attached as **Exhibit B**. Petitioner did not file a Motion for Reconsideration.

13.     Petitioner <u>did not</u> file a petition for certiorari in the United States Supreme Court following the decision of the highest State court reviewing his appeal of right.

14.     Petitioner <u>has</u> filed a subsequent collateral attack to his conviction in the State Court prior to filing this Petition.   Specifically, Petitioner filed a Motion for Relief from Judgment pursuant to Michigan Court Rule 6.500 and a supplement thereto, both of which were docketed on <u>10-02-2008</u> with the trial Court.  Petitioner's initial 6.500 motion raised all of the same issued raised in his appeal of right, as well as adding a count of ineffective assistance of

appellate counsel.  His supplemental 6.500 motion and brief, filed long before the trial court

issued its opinion and order on the merits, also raised the following new issues:

> **I.       Mr. Clark has newly discovered evidence to support his claim of actual innocence and to support a claim of police misconduct by Detective DelGreco impeding with witnesses.  All facts of Mr. Clark's defense of innocence were not presented to support his claim.  Therefore, a miscarriage of justice has resulted in an innocent person's incarceration.**

> **II.      Mr. Clark's trial was fundamentally unfair where the prosecuting attorney demonstrated a personal belief of the Defendant's guilt which motivated the misconduct and offending closing commentary.  Prosecution vouched for witnesses and evidence. U.S. Const. Am. V, XIV.**

> **III.     Mr. Clark was denied a fair trial by a manifested Brady violation when Detective DelGreco threatened potential witnesses with favorable evidence where the suppression of evidence is a result of police misconduct. This also demonstrates misconduct on prosecution as a domino effect.**

> **IV.      Mr. Clark was denied effective assistance of counsel in the areas of proper objections, calling expert witnesses, and pursuing the clear misconduct Brady violation, U.S. Const. Am. VI.**

That Motion was denied by the trial Court on 04/07/09.  Petitioner filed a timely Motion to

Reconsider on 04/24/09, which was denied by the trial Court on that same date.

15.     On or about 04/24/10, Petitioner filed a delayed application for leave to the

Michigan Court of Appeals to obtain State court review of his 6.500 issues on their merits and to

re-raise the issues from his supplemental 6.500 motion that were never addressed by the trial

court. Michigan Court of Appeals docket no. 297708.

16.     In lieu of granting the delayed application for leave to appeal, the Court of

Appeals entered an Order 10/29/10 remanding the matter to the trial court for a determination on

the merits of all of Petitioner's 6.500 claims.  **Exhibit C**.

17.     On 07/13/2011, Petitioner filed a supplementary brief in support of his 6.500 with the trial court, and the trial court held a hearing on his 6.500 Motion on 09/09/11.

18.     On 09/09/11, the trial court denied Petitioner's request for an evidentiary hearing pursuant to People v Ginther,[1] and summarily denied Petitioner's 6.500 motion on the merits.

19.     On 09/30/11 Petitioner filed his renewed application for leave to appeal to the Michigan Court of Appeals, which was granted 05/17/12. Michigan Court of Appeals docket no. 307338.

20.     On 05/14/13, the Court of Appeals issued an unpublished opinion affirming Mr. Clark's convictions.  **Exhibit D.**

21.     On 07/10/13, Petitioner filed his application for leave to appeal to the Michigan Supreme Court.

22.     The Michigan Supreme Court subsequently mailed the application back to Petitioner's counsel, stating that it had been filed one (1) day late and would not be accepted.

23.     On 09/27/13, Petitioner filed a Motion for Miscellaneous Relief, seeking reissuance of the Court of Appeals Opinion or, in the alternative, acceptance of the application for leave to the Michigan Supreme Court as timely filed. **Exhibit E**.

24.     On 08/12/13, the Motion was denied by ruling letter. **Exhibit F**.

25.     Pursuant to 28 U.S.C. §2254(b)(1)(B)(ii), circumstances exist that render the process of the State Court exhaustion requirement ineffective to protect the rights of Petitioner Clark.

---

[1] 390 Mich 436 (1973).

26.     There is a legitimate cause for the default: Petitioner relied upon his counsel to file his application to the Michigan Supreme Court timely. Petitioner's counsel relied to his detriment on the "time calculator" function of the Michigan Court of Appeals website and believed that he had filed the application for leave to appeal to the Michigan Supreme Court timely.

27.     The default resulted in severe prejudice to Petitioner: Petitioner was prohibited from the Michigan Supreme Court reviewing the supplemental legal issues raised as part of his 6.500 motion on their merits because the Michigan Supreme Court rejected his application, holding that it was filed one (1) day late.

28.     Additional prejudice to Petitioner would result if this Court would find that he is now procedurally barred from having this Court review the supplemental issues on their merits, and would limit its review to only those issues that had previously been fully exhausted through the State Court appellate system.

29.     Additionally, Petitioner is actually innocent of the crimes of conviction. His testimony in his own defense, the absence of any direct physical evidence linking him to the crimes of conviction, coupled with the contradictory and unclear testimony of the live witnesses during his trial, and the newly discovered evidence of two lay witnesses who had not testified at his trial, all support a finding of actual innocence.

30.     Failure of this Court to review all of Petitioner's claims on their merits would result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722 (1991), *citing*: Murray v. Carrier, 477 U.S. 478, 485, 495 (1986).

31.     Petitioner requests that this Court entertain all legal issues raised in the instant Petition for these reasons, even though there was no Michigan Supreme Court review of the supplemental 6.500 motion issues on their merits.

32.     Petitioner claims that he is being held unlawfully for the following reasons: *See attached brief* in support of Habeas Corpus Petition for factual basis and legal arguments on the following issues:

> **I.   Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV,  where insufficient evidence was introduced at trial to support all three convictions.**
>
> **II.  Petitioner was denied his constitutional rights to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, due to prosecutorial misconduct during the course of his trial.**
>
> **III.Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court improperly allowed the prosecution to play the 9-1-1 phone call audio recording to the jury several times, over defense objection that it was more prejudicial than probative.**
>
> **IV.  Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court improperly instructed the jury.**
>
> **V.  Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court failed to declare a mistrial after the jury reporting deadlock after several days of deliberations.**

33.     All of the preceding grounds for relief raised in the instant Petition have been presented to the highest State Court having jurisdiction over this case for determination.

34.     Petitioner also claims that he is being held unlawfully for the following additional reasons:  *See attached brief* in support of Habeas Corpus Petition for factual basis and legal arguments on these issues.  The following grounds for relief raised in the instant Petition were <u>not</u> considered on their merits by the highest State Court having jurisdiction over this case for determination due to procedural default:

> **VI. Petitioner was denied his right to effective assistance of trial counsel pursuant to U.S. Constitution, Amd. VI in multiple ways during his trial, which in turn directly resulted in a denial of his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV.**

> **VII.       Petitioner was denied his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV, when the Inkster Police Department engaged in misconduct by intimidating two known defense witnesses prior to trial, resulting in a miscarriage of justice.**

> **VIII.  Petitioner was denied his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV, due to additional deliberate, flagrant and prejudicial prosecutorial misconduct that seriously undermined the integrity and fairness of Petitioner's trial.**

35.     There are no other petitions, motions or appeals currently pending regarding the judgment now under attack in any State or Federal Court.

36.     The attorneys who have represented Petitioner are as follows:

(a)     <u>At preliminary examination</u>:  Raymond R. Burkett (P 30155), 220 Bagley Street, Ste. 210, Detroit, MI 48226; (313) 961-0192.

(b)     <u>At trial</u>:   Raymond R. Burkett (P 30155)

(c)     <u>At sentencing</u>:  Sanford A. Schulman (P 43230), 500 Griswold, Ste. 2340, Detroit, MI 48226; (313) 963-4740.

(d)     <u>On first appeal of right Court of Appeals</u>:  Jonathon B.D. Simon (P 35596), 645 Griswold, Ste. 717, Detroit, MI 48226; (313) 964-0533; and Sanford A. Schulman.

(e)     <u>On first appeal of right Michigan Supreme Court</u>:  pro se.

    (f)       <u>On MCR 6.500 collateral attack motion</u>: pro se.

    (g)      <u>On delayed leave to appeal denial of MCR 6.500 collateral attack motion</u>:  Tracie Dominique Palmer (P 53555), 803 Tenth Avenue, Ste. C, Port Huron, MI 48082; (810) 985-5107.

    (h)      <u>On remand to the trial court, leave to appeal to the Michigan Court of Appeals, and leave to appeal to Michigan Supreme Court:</u> David S. Steingold (P 29752), 400 Monroe, Ste. 280, Detroit, MI 48226; (313) 962-0000.

37.    Petitioner was sentenced on more than one count of the charging

information at the same time in the same Court.

38.    Petitioner does not have any future sentences to serve after he completes

the sentence imposed by the judgment and conviction under attack in this Petition.


    WHEREFORE, for the reasons cited above and in the brief in support of this

Petition, Petitioner ALPHONSO MITCHELL CLARK, #506485, respectfully requests

that this Court GRANT him the following relief:

    A.      GRANT Petitioner's request to review all of his legal issues raised in his Amended Petition for Habeas Corpus relief on their merits, finding that as to issues VI, VII and VIII, Petitioner has demonstrated that he meets an exception to the application of the procedural bar rule by proving cause and prejudice;

    B.      In the alternative, GRANT Petitioner's request to review all of his legal issues raised in his Amended Petition for Habeas Corpus relief on their merits, including issues VI, VII and VIII, finding that failure to consider all of the claims will result in a fundamental miscarriage of justice, as Petitioner asserts that he is actually innocent of the charges of conviction;

    C.      GRANT his Amended Petition for Habeas Corpus relief on its merits, pursuant to 28 U.S.C. Section 2254;

D.      ORDER Respondent to appear and answer all of the allegations in this Petition by a date certain;

E.      GRANT Petitioner an evidentiary hearing to expand the record as this Court deems necessary prior to ruling on the merits of this Petition;

F.      GRANT Petitioner oral arguments prior to this Court issuing a Report and Recommendation on the issues raised in this Petition;

G.      GRANT Petitioner relief from the ongoing unconstitutional restraint on his liberty following a full and fair consideration of the issues raised in this Petition on their merits;

H.      GRANT any and all other relief this Court finds is proper and necessary, given the facts and circumstances of this case.

Respectfully submitted,

*/s/ David S. Steingold*
LAW OFFICES OF DAVID S. STEINGOLD
BY: DAVID S. STEINGOLD (P 29752)
400 Monroe Street, Ste. 280
Detroit, MI 48226
(313) 962-0000  (voice)
(313) 962-0766  (fax)
detroitdefender@yahoo.com

**DATED:  April 16, 2014**

**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**

ALPHONSO MITCHELL CLARK, #506485
ST. LOUIS CORRECTIONAL FACILITY
8585 N. Croswell Road
St. Louis, MI 48880
                    Petitioner

                                        Case No. 2009-CV-13088
v.                                      Hon. LUDINGTON
                                        Hon. Magistrate:  MORGAN

NICK J. LUDWICK, *WARDEN*,
                    Respondent
_____/
LAW OFFICES OF DAVID S. STEINGOLD          ATTORNEY GENERAL OF MICHIGAN
BY:  DAVID S. STEINGOLD (P 29752)          BY:
Attorney for Petitioner                    Attorney for Respondent
400 Monroe Street, Ste. 280                300 S. Washington, Ste. 530
Detroit, MI  48226                         Lansing, MI 48913
(313)  962-0000  (voice)                   (517)  335-1488
(313)  962-0766  (fax)
detroitdefender@yahoo.com
_____/

**BRIEF IN SUPPORT OF AMENDED PETITION**
**SEEKING HABEAS CORPUS RELIEF PURSUANT TO 28 U.S.C. §2254**

NOW COMES Petitioner ALPHONSO MITCHELL CLARK, #506485, by and through

his attorney DAVID S. STEINGOLD (P 29752), and in support of his Amended Petition

presents the following:

**STATEMENT OF FACTS**

Following a five-day jury trial and four days of jury deliberations, Petitioner Alphonso

Clark was found guilty of all three criminal charges originally brought against him.  Petitioner

Clark is currently serving a mandatory life sentence based on his conviction in Count I of first-

degree murder.  Petitioner Clark asserted his innocence by testifying in his own defense at trial,

11

and continues to assert his innocence to date.  The general summary of the relevant facts of the case provided herein is supplemented with additional facts established during trial throughout the argument section.

The case involves the shooting death of Mr. Gregory Marshall on June 17, 2005, outside of his home in the City of Inkster, Michigan.  Around approximately 11:30 pm, Terrence Jones and Kimberly Jones were sitting outside on the front porch of 4029 Irene Street, the house where Terrence Jones resided with his brother, Mr. Marshall, and their mother, Ms. Berdia Marshall. (Tr. Vol. I at 193-195; Vol. II at 99-101, 104).  It was dark outside, and there was no porch light or exterior lights turned on to illuminate the front yard.  (Tr. Vol. II at 37; Vol III at 34, 36).  Mr. Marshall was outside the house when a person dressed all in dark clothing and wearing a black hooded sweatshirt with the hood over his head walked up to Mr. Marshall and started talking with him. (Tr. Vol II at 108, 138). When Mr. Marshall started to back up, the person then shot him several times.  (Tr. Vol II at 67, 107-111, 138). Afterward, the man walked past Kimberly Jones, who was still sitting on the front porch. Ms. Jones could not see his face, eyes, or even his teeth because the hood was pulled over his head.  (Tr. Vol II at 109).  The gun used in the shooting was never recovered. (Tr. Vol III at 12, 16, 28).

While Terrence Jones and Kimberly Jones both watched the entire shooting, Terrence Jones was the only one who identified Mr. Clark as the shooter.  (Tr. Vol. I at 226-228; Tr. Vol. II at 15, 107-111).  Ms. Jones testified that the shooter she watched did not fit the description of Mr. Clark.  (Tr. Vol. II at 132).  The version of the shooting testified to by Terrence Jones contradicted the testimony of Kimberly Jones (Tr. Vol. II at 106-118, 143: describing Mr. Jones' version of the shooting as "ridiculous."), as well as the forensic evidence testified to by medical

examiner Dr. Scott Somerset that there was no evidence of a close-range shooting.  (Tr. Vol. I at 179-180, 187).  Witness Lucresha Baker, who lives four houses away from the location of the shooting, testified that she witnessed the shooting from outside her home when she got home from work at approximately 11:50 pm. (Tr. Vol. IV at 52-73).  She testified that she knew both Mr. Clark and Mr. Marshall prior to witnessing this incident, and that the shooter was not Mr. Clark. (Tr. Vol. IV at 55, 59, 64, 66).  Ms. Baker stated that she tried to make a statement about what she saw to the Inkster police, but that they were not interested in taking her statement. (Tr. Vol. IV at 59-60, 85-86, 95).

Prior to the commencement of trial, the defense moved to suppress the admission of the audio tape recording of the 9-1-1 made by the mother of the victim, because her statements about her son being shot by Mr. Clark and "was laying out in the street" were not based upon her own personal knowledge, but merely a repetition of the hearsay statements of her son, Terrence Jones, who had come into the house after the shooting had taken place.  The motion was denied by the trial court and the audio tape was admitted as an excited utterance.  (Tr. Vol I at 9-11, 160).  The 9-1-1 tape (and portions thereof) was then played for the jury three times during trial: once during the testimony of Terrence Jones (Tr. Vol. II at 84-85); and a second time during the testimony of Berdia Marshall (Tr. Vol. III at 44-46, 49).

Based upon the allegations of Terrence Jones, the police arrested Mr. Clark the following day.  Alicia Hunter testified that on the night of the shooting, she (along with her daughter) had picked up Mr. Clark from the Irene residence at approximately 11:15 pm, picked up pizza at Little Caesars, and then they went to her residence to eat.  (Tr. Vol. III at 68-74). The surveillance video from Little Caesars showed that Ms. Hunter and her daughter were inside

picking up the pizza at 10:31 pm.  (Tr. Vol. III at 146-148).  She testified that Mr. Clark did

leave her house after eating, but returned later that same night.  (Tr. Vol. III at 87-90).  Mr. Clark

then spent the night at her house, and was arrested the following day while they were still

together, wearing the same clothing he had been wearing the night before.  (Tr. Vol. III at 92,

100).

      Mr. Clark testified in his own defense at trial, asserting his actual innocence of the crimes

of conviction.  (Tr. Vol. IV at 112-170).  Mr. Clark testified about how he knew Gregory

Marshall and his family very well, and often "hung out" at their home.  (Tr. Vol. IV at 118-119,

153, 164).  He stated that the night of the shooting, he had been at the Marshall home between

10:00 and 10:30 pm, and had spoken with Mr. Marshall about "how he shot up Jerel house,

everybody was hot, so I told him the feuding needed to stop."  (Tr. Vol IV at 120).  He testified

that Alicia Hunter picked him up from the Marshall home sometime after 11:00 pm that night,

and that as he was leaving he saw the shadows of two people sitting on the front porch.  (Tr. Vol.

IV at 122-124).  He then went to Ms. Hunter's house, ate pizza, borrowed her truck to go visit

his father, then went back and spent the night at Ms. Hunter's house.  (Tr. Vol. IV at 126).  He

testified that the following morning, Mr. Jerel Dillard called him and asked him to meet him in

Romulus, where Mr. Clark was subsequently arrested.  (Tr. Vol. IV at 126-130, 162).

      Detective DelGreco, the Inkster Police Department Officer in Charge of the investigation,

testified that he seized Mr. Clark's clothing upon his arrest and submitted them to the crime lab

for testing for any evidence of gunpowder, gunpowder residue or blood.  (Tr. Vol. III at 148-149,

174-175).  Mr. Clark's clothing, however, was only tested by the Michigan State Police crime

lab for blood, and was never tested for gunpowder residue.  (**Exhibit G**: MSP lab report).

Detective DelGreco never performed a gunpowder residue or paraffin test on Mr. Clark.  (Tr.

Vol. III at 196, 198-199).

      During jury instructions, the trial court read the "lying in wait" instruction to the jury,

over defense objection.  (Tr. Vol. V at 12, lines 15-24; 29-30).

      The jury indicated that it was deadlocked on the second day of deliberations, and the trial

court ordered them to continue their deliberations. (Tr. Vol. VI at 4-5).   The jury sent out notes

requesting transcripts of the trial testimony of Terrence Jones and Kimberly Jones, as well as the

Preliminary Examination transcript testimony of Jerel Dillard.  (Tr. Vol. VI at 6-8).  On Friday,

November 11, 2005, the third day of deliberations, the jury sent out another note stating they

were deadlocked, and disclosing that "we are eight-four guilty originally. At this point we are at

11-one guilty.  One juror is still not convinced of guilty, indicates he will not change his belief,

we are deadlocked, no hope of change." (Tr. Vol. VII at 3-4).  The trial court ordered the jury to

continue to deliberate and to follow his instruction not to disclose the status of the voting.  (Tr.

Vol. VII at 5).  The defense then moved for a mistrial, which was denied.  (Tr. Vol. VII at 8-12).

Shortly after the judge had sent the jury back in to continue their deliberations, the jury returned

a verdict of guilty on all three counts.  (Tr. Vol. VII at 17).

## **ARGUMENT**

      The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), [Pub. L. No.

104-132, 110 Stat. 1214 (April 24, 1996)], 28 U.S.C. Section 2254(d)(1) (1996), applies to this

Petition for Habeas Corpus relief.  With respect to the standard of review governing habeas cases

filed after April 24, 1996, 28 U.S.C. §2254(d) provides that:

        An application for a writ of habeas corpus on behalf of a person in custody
        pursuant to the judgment of a State court shall not be granted with respect to

any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

In Harris v. Stovall, 212 F.3d 940 (6th Cir. 2000), the Sixth Circuit found that he standard of review to be used in determining whether a state court's decision was "contrary to" federal law, or involved an "unreasonable application" of clearly established federal law, was set forth in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Harris cites the holding of the Supreme Court in Williams as follows:

a decision of the state court is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id at 1523, 120 S.Ct. 1495. The Court further held that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. A federal habeas court may not find a state adjudication to be "unreasonable" simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id at 1522, 120 S.Ct. 1495.

Harris, *supra*, at 942.  The Harris v. Stovall court therefore held that the standard of Nevers v.

Killinger, 169 F.3d 352 (6ᵗʰ Cir. 1999), *cert den*, 527 U.S. 1004, 119 S.Ct. 2340, 144 L.Ed.2d

237 (1999) and Maurino v. Johnson, 210 F.3d 636 (6ᵗʰ Cir. 2000) no longer correctly state the

law on the issue.

     When this Court reviews the state courts' actions in any state prisoner habeas corpus

proceeding, there is a presumption of correctness to the state court findings of basic, primary or

historical facts:

> The relevant portion of the new habeas statute requires the petitioner to carry a
> more difficult burden in rebutting the presumption of correctness accorded to
> state court fact findings:  In a proceeding instituted by an application for a writ
> of habeas corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall be presumed
> to be correct. The applicant shall have the burden of rebutting the presumption
> of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

United States *ex rel*. Roman v. Washington, 1996 U.S. Dist. LEXIS 14106 (D. Ill. 1996).

     In Petitioner Clark's case, the state court's interpretation of the federal Constitution, as

well as its interpretation of several clearly established Supreme Court and federal court

precedents, was unreasonable. Under the standards set forth by the Sixth Circuit in Harris, *supra*,

Petitioner hereby requests that this Court grant his application for a writ of habeas corpus.

### I.    Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV,  where insufficient evidence was introduced at trial to support all three convictions.

     The Due Process Clause of the Fourteenth Amendment protects an accused in a criminal

case against conviction except upon proof beyond a reasonable doubt. In re Winship, 397 U.S.

358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  In Adams v. Smith, 280 F.Supp.2d 704 (E.D. Mich.

2003), Judge Tarnow summarized the Federal Court's standard of review of a State prisoner's

claim that insufficient evidence was introduced during trial to support his State court convictions.

Adams held that, pursuant to Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61

L.Ed.2d 560 (1979), an insufficient evidence claim by a State habeas Petitioner requires the

Federal District Court to inquire as to:

> "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."
>
> *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (internal citation and footnote omitted) (emphasis in original).
>
> The Court must view this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell,* 280 F.3d 594, 617 (6th Cir.), *cert. denied,* 537 U.S. 1004, 123 S.Ct. 515, 154 L.Ed.2d 401 (2002). In addition, the *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324 n. 16, 99 S.Ct. 2781. "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Matthews v. Abramajtys,* 319 F.3d 780, 788-89 (6th Cir.2003).

Adams, 280 F.Supp.2d at 714.  The habeas court does not substitute its judgment for that of the

finder of fact. United States v. Jackson, 55 F.3d 1219, 1225 (6th Cir.1995).

There was no physical evidence produced at trial that connected Mr. Clark to the

shooting of Gregory Marshall.  When the MSP Crime Lab tested Mr. Clark's clothing, they

found no evidence of Mr. Marshall's (or anyone else's) blood on them.  The gun used in the

shooting was never found. (Tr. Vol. III at 139).  The MSP Crime Lab did not test Mr. Clark's

clothing for gunpowder residue, in spite of OIC DelGreco's testimony that he had requested such

testing. (**Exhibit E**; Tr. Vol. III at 208-219).  OIC DelGreco testified that he never had Mr.

Clark's hands tested for gunpowder residue, in spite of the fact that the shooting happened at

some point between 11:00 pm and midnight, and he arrested Mr. Clark the following afternoon. No physical evidence was found related to the homicide following a search (with consent) of Alicia Hunter's white SUV allegedly driven by Mr. Clark immediately before the shooting.  (Tr. Vol. III at 143-145, 177-178).  There was only one bullet fragment found after a thorough search of the scene of the shooting, and it was not connected to any particular gun.  (Tr. Vol. III at 138-139).

Two eyewitnesses to the shooting, Ms. Jones and Ms. Baker, both testified that the shooter they saw did <u>not</u> match the physical description of Mr. Clark.  (Tr. Vol. II at 132-133; Tr. Vol. IV at 55, 59, 66).  Ms. Jones testified that Mr. Clark was too short to be the shooter, and further that she did not even know who Mr. Clark was before this case.  (Tr. Vol. II at 132-133).  Ms. Berdia Marshall, who made the emotional 9-1-1 call, was inside the house during the entire shooting, never saw the person who shot her son, and made the statements in the 9-1-1 tape relying exclusively upon the hearsay information given to her by her son Terrence Jones.  (Tr. Vol. III at 41).  There was no motivation for either of these eye witnesses to lie about Mr. Clark not matching the physical description of the shooter.

The <u>only</u> evidence that the prosecution had against Mr. Clark was the biased testimony of Terrence Jones, that was contradicted by his own prior statements to the police, the testimony of the person *sitting right next to him* on the front porch during the shooting, as well as by the physical evidence presented by the medical examiner, and the location of the blood stains on the sidewalk.  Mr. Jones admitted during cross examination that he changed his testimony about seeing the shooter's face, and that at preliminary examination he had testified that the shooter had a "hood pulled over his face."  (Tr. Vol. II at 67).  Mr. Jones even admitted to his family

following the shooting that he tampered with the crime scene before the police arrived:  he

purposely removed narcotics from his dead brother's body so the police would not find them.

(Tr. Vol. II at 148-149).

The evidence produced at trial cannot be deemed sufficient by any stretch of the

imagination, even after viewing all of it in the light most favorable to the prosecution, such that

*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.  The jury in this case obviously had troubles believing the prosecution's case:

it twice indicated that it was hopelessly deadlocked during deliberations.  Pursuant to Jackson v.

Virginia, *supra*, and its progeny, as well as U.S. Const. Amds. V, VI and XIV, Mr. Clark's

convictions are in violation of his Federal constitutional rights and this Court must grant the

relief requested in the instant Petition.

### II.  Petitioner was denied his constitutional rights to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, due to prosecutorial misconduct during the course of his trial.

The duty of the prosecutor is much more than to win cases.  He or she has an obligation

to ensure a defendant has a fair trial.  Berger v United States, 295 US 78; 55 S Ct 629; 79 LEd2d

1314 (1935).  The prosecutor in this case failed in that obligation, and Mr. Clark was denied a

fair trial as a result.  US Const, Amd. XIV.

Petitioner must demonstrate that the misconduct "so infected the trial with unfairness as

to make the resulting conviction of a denial of due process." Donnelly v DeChristoforo, 416 US

637, 643; 94 S Ct 1868; 40 L Ed2d 431 (1974).  The misconduct must be "so pronounced and

persistent that it permeates the entire atmosphere of the trial" or "so gross as probably to

prejudice the defendant" to result in a denial of due process.  Pritchett v Pitcher, 117 F3d 959,

964 (6th Cir. 1997).  In this case, the actions of the prosecutor at this short trial were so

outrageous and unprofessional that they permeated the trial and deprived Mr. Clark of his due

process rights.

During the course of Mr. Clark's trial, the prosecution repeatedly tried to introduce

testimonial evidence through its main witness Terrence Jones that Petitioner Clark had been

involved in drug dealing activities with victim Marshall on the night of the murder.  The Court of

Appeals summarized the relevant facts:

> When the prosecutor asked Jones what went on earlier between the victim and
> defendant in the basement of the victim's home, Jones replied that it was probably
> something to do with drugs, and this answer was stricken based on a lack of personal
> knowledge.
> . . .
> During Jones's testimony regarding the second time the victim and defendant were in
> the basement, Jones stated that the victim *told* him that he conducted a drug
> transaction. Again, the trial court struck the statement for lack of personal knowledge.
>
> We fail to see any bad faith on the part of the prosecutor because the testimony was
> arguably admissible and because, again, Jones conceivably may have viewed drug activity
> during the second meeting in the basement. There was no misconduct.

COA Slip Op. at 3-4, **Exhibit A**.  The Court of Appeals then reasoned that if there was

misconduct, it was harmless.  Id. at 4.

The only testimony insinuating that Mr. Clark was engaging in narcotics transactions

with Mr. Marshall prior to his death came from witness Terrence Jones: the only witness that

identified Mr. Clark as being the shooter.  The 9-1-1 tape of Ms. Marshall's call identifying Mr.

Clark as the shooter was highly prejudicial, as Ms. Marshall's statements to the 9-1-1 operator

were not based upon her own first-hand personal knowledge, but rather she was merely repeating

the information her son Mr. Jones had told her to say.  Given the numerous contradictions in Mr.

Jones' statements between what he first told the police investigating the crime, to his preliminary

examination testimony, through his later trial testimony, it is apparent that Terrence Jones had his own personal agenda to make sure that Mr. Clark was framed and convicted of the shooting of his brother by any means necessary.

The prosecution committed misconduct by actively eliciting what it knew would be otherwise inadmissible testimony about uncharged crimes involving narcotics to try and paint Mr. Clark as a "bad person" in the eyes of the jury. The prosecution knew or should have known that Mr. Jones necessarily had to speculate about what was going on in the basement of the Marshall home during Mr. Clark's earlier visits with Mr. Marshall because Mr Jones' testimony was clear that he was on the front porch the entire time! When the prosecutor asked if Jones knew what was going on in the basement, he effectively led Mr. Jones into a position where he could get the testimony that he "figured it had something to do with drugs" in front of the jury before the defense had time to object and prevent the jury from hearing such prejudicial, non-admissible, speculative testimony. (Tr. Vol. I at 207). The defense objection was sustained and the answer was stricken, but the damage had already been done: the jury heard that Mr. Clark was supposedly a drug dealer.

The prosecution did not stop there, however. He asked the same question a second time and again purposely elicited the testimony from Mr. Jones that he guessed that Mr. Clark was doing a "drug transaction" in the basement with his brother Mr. Marshall prior to the shooting. (Tr. Vol. I at 216). While the defense objections to each of these instances of prosecutorial misconduct were sustained, the trial Court denied the defense request for a curative jury instruction and denied the defense motion for a mistrial. (Tr. Vol. I at 216, 232). This misconduct was repeated, blatant, and was committed during the testimony of the prosecution's

"star" witness:  the only person they could produce that identified Mr. Clark as the shooter.  The

prejudicial effect of this misconduct, contrary to the assertions of the Michigan Court of Appeals,

necessarily was great.

The prosecutor's misconduct in this case was "so gross as probably to prejudice the

defendant," and was sufficient to result in a denial of due process.  Pursuant to the holdings of

Donnelly v DeChristoforo, supra, and  Pritchett v Pitcher, supra, this Court must grant the relief

requested in the instant Petition.

### III. Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court improperly allowed the prosecution to play the 9-1-1 phone call audio recording to the jury several times, over defense objection that it was more prejudicial than probative.

The United States Supreme Court and the Sixth Circuit have both established that alleged

trial court errors in the application of state evidentiary law, particularly regarding the

admissibility of evidence at trial, generally are not sufficient grounds for granting a writ of

habeas corpus.  Pulley v. Harris, 465 U.S. 37, 41; 104 S.Ct. 871; 79 L.Ed.2d 29 (1984); Burgett

v. Texas, 389 U.S. 109, 113-114; 88 S.Ct. 258; 19 L.Ed.2d 319 (1967); Olsen v. McFaul, 843

F.2d 918, 933 (6th Cir. 1988).  However, where the admission of the evidence at issue resulted in

depriving the petitioner of fundamental constitutional guarantees, and resulted in the petitioner's

trial being "so fundamentally unfair as to constitute a denial of federal rights," the challenged

State-court evidentiary ruling may provide grounds for habeas corpus relief.  Estelle v. McGuire,

502 U.S. 62, 69-70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991);  Clemmons v. Sowders, 34 F.3d

352, 356-357 (6th Cir. 1994); McAdoo v. Elo, 365 F.3d 487, 494 (6th Cir. 2004), cert. denied,

543 U.S. 892, 125 S.Ct. 168, 160 L.Ed.2d 156 (2004).

Petitioner Clark repeatedly objected to the prosecution's use of the 9-1-1 recording, twice prior to trial commencing and again during the course of the trial. (Tr. I, 11-03-05 at 10-11, 160; Tr. III 11-07-05 at 44-46, 49). The Court of Appeals in the case at bar held that the playing of the 9-1-1 tape was relevant, and that the fact that it was played more than once was not unduly prejudicial to the defense:

> The contents of the 911 tape were clearly relevant and probative because the identity of the shooter and witness credibility were key issues. Multiple voices are heard on the tape, including that of Jones and his and the victim's mother, and the events on the tape corroborated Jones's testimony at trial that defendant was the gunman and his version of the events. The 911 tape was played a second time, but only a very short portion of the tape, in order to allow the victim's mother to authenticate her own voice. While the playing of the tape may have elicited an emotional response from the jurors, we cannot find that the probative value was substantially outweighed by the danger of unfair prejudice. Given the deferential standard of review, i.e., abuse of discretion, we hold that the trial court did not abuse its discretion in admitting the 911 tape.

COA Slip Op. at 3.

The 9-1-1 recording was played at least twice times in the presence of the jury. First, it was played during the testimony of Terrence Jones, over defense objection. (Tr. Vol. II at 84-85). Second, it was played during the testimony of Ms. Berdia Marshall, again over defense objection. (Tr. Vol. III at 44-46, 49). The 9-1-1 call was made by Ms. Marshall, who was inside the house, did not see the shooting, and was merely following the instructions of her son Terrence Jones to call 9-1-1 and tell them that Mr. Clark had shot and killed his brother Greg, and that Greg was lying in the street dead. She had absolutely no first-hand personal knowledge that anything she was stating was true at the time she said it: she was merely repeating exactly what her son Terrence Jones wanted her to say. Given the complete lack of credibility of

Terrence Jones established during the trial, however, the veracity of any of the "factual" statements contained in the 9-1-1 call is highly suspect.

The 9-1-1 recording was highly prejudicial: it was very emotionally charged and had a devastating effect.  The prosecution asserted the tape was relevant to not only identify Mr. Clark as the shooter, but also to identify the voices of witnesses Terrence Jones and Berdia Marshall. This argument, while inexplicably convincing to the trial court and court of appeals, is circular. Terrence Jones was the only person who ever identified Mr. Clark as the shooter: the statements in the 9-1-1 call by Berdia Marshall are based solely upon Terrence Jones' claim that Mr. Clark was the shooter.  It was not contested that Berdia Marshall was the person who called 9-1-1: that was (and is) a non-issue.   The 9-1-1 recording in and of itself had absolutely no probative value. The trial court erred in admitting it.  Its repetitive playing necessarily had a prejudicial effect on the reactions of the jury:  in their final note describing their deadlock situations, the jury indicated that at its first deadlock only 42 minutes after starting deliberations, the voting already stood at 8 to 4 votes in favor of Mr. Clark's guilt.  (Tr. Vol. VI at 5; Tr. Vol. VII at 3-4).

Mr. Clark has consistently proclaimed his innocence since the beginning of this case. These convictions rest solely upon the testimony of Terrence Jones: testimony which was impeached multiple times and which contradicted all other evidence (physical and eyewitness testimony) produced by *both* sides at trial.  His Petition presents one of those rare instances where the State court evidentiary ruling admitting the 9-1-1 tape acted to deprive him of his fundamental constitutional guarantees to due process and a fair trial, and indeed resulted in his trial being so fundamentally unfair as to constitute a denial of his federal rights.  Pursuant to the

holdings of <u>Estelle v. McGuire</u>, *supra*; <u>Clemmons v. Sowders</u>, *supra*; and <u>McAdoo v. Elo</u>, *supra*, this Court must grant the writ of habeas corpus as requested by the instant Petition.

### IV. Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court improperly instructed the jury.

In general, jury instructions violate a petitioner's right to a fair trial when they are contrary to state law and undermine the reliability of a verdict. <u>Kordenbrock v. Scroggy</u>, 919 F.2d 1091, 1120-21 (6th Cir. *en banc* 1990); <u>Williams v. Anderson</u>, 460 F.3d 789 (6th Cir. 2006). Errors in jury instructions are generally not cognizable in federal habeas corpus unless they deprive petitioner of a fundamentally fair trial. <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); <u>Wood v. Marshall</u>, 790 F.2d 548, 551-52 (6th Cir.1986); <u>Thomas v. Arn</u>, 704 F.2d 865, 868-69 (6th Cir.1983). A habeas petitioner challenging jury instructions must establish that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

In Mr. Clark's case, the trial court instructed the jury at the close of proofs that it could find Mr. Clark guilty of first-degree premeditated murder if it found:

> The – it is alleged that the killing in this case was done willfully with premeditation and deliberation by lying – possibly by lying in wait. Lying in wait means the defendant hid himself planning to take another person by surprise. While lying in wait, the defendant must have intended to kill Gregory Marshall. Lying in wait must have lasted only long enough to show beyond a reasonable doubt that killing was done willfully with premeditation and deliberation.

(Tr. Vol. V at 12, lines 15-24). The Court of Appeals found that a rational view of all evidence produced at the trial Court level provided an adequate factual basis for the trial court's decision

to give the "lying in wait" instruction to the jury.  COA Slip Op. at 4, **Exhibit A**.  In so finding,

the Court of Appeals summarized:

> A rational view of the evidence supports a finding that defendant may have been
> hiding behind or somewhere in the vicinity of the victim's house and planning to take
> the victim by surprise. There was evidence that defendant pulled up in front of the
> victim's house in the SUV and that the victim joined defendant in the vehicle for
> three or four minutes. The victim then exited the SUV and started walking toward his
> house. Defendant then drove to the next street and turned right. When the victim
> calmly neared his home, he suddenly looked to his left, startled, and started running
> as defendant chased him down and shot him. We find no error with the instruction as
> there was evidentiary support. And even if the instruction lacked evidentiary support,
> there was no prejudice to defendant, where the jury agreed that he was the shooter,
> and where the circumstances of the shooting clearly established a premeditated and
> deliberate killing, considering that the victim was chased, shot once, fell down, was
> approached up close, and was then repeatedly shot again.

Id.  Petitioner Clark asserts that these findings of fact by the State appellate court are inherently

contradictory and an inaccurate summary of the facts as presented through trial testimony.

The Court of Appeals made findings of fact that contradict the trial testimony, and arguably

contradict themselves.  It finds that both the accused and the victim pulled up to the house on Irene in

the same vehicle.  When the victim got out of the vehicle to walk to his house, the accused drove

away and turned right down the next street.  The court of appeals makes no findings of fact, nor does

the trial testimony indicate, which way the SUV was travelling down the street in front of the

victim's house when (and after) it dropped him off.  If the victim looked to the "left" before he was

shot, we have no idea whether or not this was in the direction that the SUV allegedly drove to

previously.  The State appellate court went out of its way to "find" facts that would enable it to

uphold Mr. Clark's wrongful conviction.  These appellate court findings of fact are not supported by

the trial testimony and should not be subject to the general presumption of truth normally afforded by

the Federal bench upon habeas review.

The improper jury instruction was prejudicial to Mr. Clark: it told the jury that it could find him guilty of first-degree premeditated murder by applying a theory that was not supported by the evidence introduced at trial. This is most evident in the testimony of Ms. Kim Jones, one of the only three eyewitnesses who testified at trial. Ms. Jones was at a vantage point during the incident that was much closer to Mr. Marshall and the shooter than was Terrence Jones. (Tr. Vol 2 at 139, line 25, to 140, line 3). Ms. Jones testified that the shooter walked up to Mr. Marshall and engaged him in conversation. (Tr. Vol II at 108, 138). She stated that the two men were not yelling at each other during their conversation, and that she could not hear what they were saying from where she was on the porch. (Tr. Vol II at 108, lines 16-20). After the conversation, she saw Mr. Marshall back up to walk away. (Tr. Vol II at 138, lines 5-20). She did not even see a gun. (Tr. Vol II at 108). There was no indication from the testimony of Kim Jones that Mr. Marshall felt threatened by the shooter at any time: he waited as the shooter walked up to speak with him, took part in a conversation that was not heated, and started backing away when finished. None of the actions of the shooter as observed by Ms. Jones, nor of Mr. Marshall in response to the actions of the shooter, indicate that the shooter had been "lying in wait" to shoot Mr. Marshall.

The jury through its own actions, twice declaring deadlock before returning a verdict of guilt, demonstrated how influential the trial court's instructions were on its decision-making process. This was a short trial during which very little credible evidence was introduced against the accused: there was no physical evidence linking Mr. Clark to the shooting, nor even to the possession or use of a gun, and only one of the three eyewitnesses *that saw the shooter while shooting the victim* identified Mr. Clark as the shooter. The inappropriate jury instruction by itself "so infected the entire trial that the resulting conviction violates due process." <u>Cupp v. Naughten</u>, *supra*, 414 U.S. at 147.