For all of these reasons, this Court must grant the writ of habeas corpus requested by the instant

Petition.

### V.  Petitioner was denied his constitutional right to due process and a fair trial, pursuant to U.S. Constitution, Amd. V and XIV, when the trial court failed to declare a mistrial after the jury reporting deadlock after several days of deliberations.

The jury in Mr. Clark's case twice indicated that it was deadlocked during the four days

of its deliberations.  The second note indicating deadlock disclosed the status of the voting, in

direct violation of the trial court's previous instruction that the jury should never disclose the

status of their deliberations until a unanimous verdict had been reached.  In response to the note

stating that the jury was hopelessly deadlocked by a single hold-out juror, rather than granting a

mistrial, the trial court again instructed the jury to continue their deliberations.  (Tr. Vol. VII at

3-5).  Mr. Clark asserts that this compound error by the trial court resulted in the hold-out juror

being improperly pressured into conforming to the other jurors in order to return a unanimous

verdict.  A verdict of guilty on all charges was returned shortly after the trial court's instructions.

A question from a jury is a "pivotal moment" in a criminal trial. United States v Duncan,

850 F2d 1104, 1115 (6th Cir., 1988). When the jury asks a question, the trial court must assume

that at least some of the jurors are confused and the confusion arises at least in part from the

initial instructions. United States v Combs, 33 F3d 667,669-670 (6th Cir., 1994). When the jury

seeks clarification, the trial court should clear away its difficulties with "concrete accuracy".

Bollenbach v United States, 326 U.S. 607, 612-613; 66 S Ct 402; 90 LEd 350 (1946). The

propriety of a supplemental instruction is measured by whether it fairly responds to the jury's

inquiry without creating prejudice. United States v Nunez, 889 F2d 1564, 1568 (6th Cir. 1989).

The trial court exercises its discretion in deciding how to respond to juror requests. Id at 1568.

Failure to give sufficient supplemental instructions may be an abuse of discretion and result in

prejudicial error. Id at 1569.

In Mr. Clark's case, the Court of Appeals held that Mr. Clark may have procedurally

defaulted on this issue when his attorney consented to the second re-instruction of the jury

following its second indication that it was deadlocked:

> We first note that it is arguable that defendant effectively waived any claim that the
> court erred by having the jury continue deliberating on Monday morning when
> defense counsel agreed with the giving of the deadlocked-jury instruction, which
> necessarily sent the jury back to the jury room to continue deliberations. See *People v
> Carter,* 462 Mich 206, 215, 219; 612 NW2d 144 (2000). Instead of objecting to the
> deadlocked-jury instruction and demanding that deliberations cease and that a mistrial
> be granted, defendant allowed the instruction without objection, allowed deliberations
> to resume, and then requested a mistrial. Regardless, reversal is unwarranted.

COA Slip Op. at 6, **Exhibit A**.  The Court of Appeals then, however, did examine the issue on its

merits, finding no error.

As summarized by this District in the case of <u>Williams v. Withrow</u>, 328 F.Supp.2d 735

(E.D.Mich.,2004):

> In all cases in which a state prisoner has defaulted his federal claims in state court
> pursuant to an independent and adequate state procedural rule, federal habeas
> review of the claims is barred unless the prisoner can demonstrate cause for the
> default and actual prejudice as a result of the alleged violation of federal law, or
> demonstrate that failure to consider the claims will result in a fundamental
> miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546,
> 115 L.Ed.2d 640 (1991).
>
> Such a default may occur if the state prisoner files an untimely appeal, *Coleman,*
> 501 U.S. at 752, 111 S.Ct. 2546, if he fails to present an issue to a state appellate
> court at his only opportunity to do so, *Rust v. Zent,* 17 F.3d 155, 160 (6th
> Cir.1994), or if he fails to comply with a state procedural rule that required him to
> have done something at trial to preserve his claimed error for appellate review,
> e.g., to make a contemporaneous objection, or file a motion for a directed verdict.
> *United States v. Frady,* 456 U.S. 152, 167-69, 102 S.Ct. 1584, 71 L.Ed.2d 816
> (1982); *Simpson v. Sparkman,* 94 F.3d 199, 202 (6th Cir.1996). Application of the
> cause and prejudice test may be excused if a petitioner "presents an extraordinary

case whereby a constitutional violation resulted in the conviction of one who is actually innocent." *Rust,* 17 F.3d at 162; *see Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Withrow, 328 F.Supp.2d at 749-750.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.

Withrow, *supra* at 751, *citing*: Schlup v. Delo, 513 U.S. 298, 326-27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). " '[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

Mr. Clark has repeatedly asserted his actual innocence of the crimes of conviction throughout this case: from his first interview with the police, through his trial testimony in his own defense, and through the instant Petition challenging the constitutionality of his convictions. Failure to consider his claim that the trial court's second deadlock instruction was unduly influential on the jury, coupled with its refusal to grant a mistrial in the face of blatant juror misconduct in ignoring its instructions not to disclose the status of the vote while deliberations were in progress, will result in a fundamental miscarriage of justice.  Williams, *supra*; Coleman, *supra*.  This second inappropriate jury instruction by the trial court, coupled with the evidence of the jury foreperson's unwillingness to follow the court's previous instructions by disclosing the status of the voting during deliberations, "so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, *supra*, 414 U.S. at 147.  For all of these reasons, this Court must grant the writ of habeas corpus requested by the instant Petition.

## SUPPLEMENTAL ARGUMENT

Petitioner requests that this Court consider the following additional issues on their merits, and hold that his State procedural default does not bar federal consideration of these claims.

Congress provided that State court remedies need not be exhausted when "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. §2254(b)(1)(A)(ii). This has been repeatedly interpreted by the courts to include exceptions to the procedural bar doctrine where either a fundamental miscarriage of justice would occur, or where cause and prejudice can be shown by the Petitioner. Coleman v. Thompson, 501 U.S. 722 (1991), *citing*: Murray v. Carrier, 477 U.S. 478, 485, 495 (1986).

>      ***A.       Failure to consider these claims will result in a fundamental miscarriage of justice because Petitioner is actually innocent***.   Petitioner has consistently maintained his innocence of the crimes of which he was convicted. He testified in his own defense at trial to assert his actual innocence. The absence of any direct physical evidence linking Mr. Clark to the crimes of conviction, coupled with the contradictory and unclear testimony of the prosecution's witnesses regarding identification of the shooter, as well as the proffered testimony of witnesses Kevin Long and Jerel Dillard, support a finding that there is a significant possibility that Mr. Clark indeed is actually innocent of these crimes. Eyewitnesses Kimberly Jones and Lucresha Baker both gave significantly different accounts of the shooting than did Terrence Jones. Jones was the only witness who testified that he believed Mr. Clark was the shooter. There was no physical evidence that tied Mr. Clark to the shooting. Even the jury was skeptical about the strength of the prosecution's case: during their four days of deliberation they told the trial court twice that they were hung and could not reach a unanimous verdict. Allowing Petitioner to continue to serve a life sentence in light of the multiple Constitutional errors that permeated his trial would be a fundamental miscarriage of justice. This Court should hold that the procedural

default in the State Court system on the following issues should not be a bar to this Court considering them on their merits.

**B.     *Federal habeas review of these claims should not be barred because Petitioner demonstrated cause for the default and actual prejudice as the result of the violations of Federal law alleged below*.**  As more fully set forth in Petitioner's motion to the Michigan Supreme Court attached as **Exhibit E**, Petitioner's counsel relied to his detriment on the "time calculator" from the Michigan Court of Appeals website to determine when Petitioner's Application for Leave to Appeal to the Michigan Supreme Court was due.  The time calculator result provided the date of July 10, 2013: one day after the expiration of the 56 days following issuance of the Court of Appeals opinion pursuant to MCR 7.302(C)(2)(b).  Since the filing deadline is jurisdictional pursuant to the Michigan Court Rules, Petitioner's application was rejected as untimely and he was prevented from having the highest State Court review his supplemental collateral attack issues on their merits.  Due to his actual innocence of the crimes of conviction, Petitioner will be actually prejudiced if this Court were to refuse to examine his supplemental issues on their merits under the procedural default bar.

The Michigan Supreme Court has no effective corrective process in place to address the cause for the default in this case: even though Petitioner's counsel demonstrated to both the Court of Appeals and the Supreme Court that the time calculator on their own website produced faulty results, thus demonstrating cause and prejudice, these State courts still enforced their default rule.  Pursuant to 28 U.S.C. §2254(b)(1)(B)(ii), Petitioner's defaulted claims meet the exception to the procedural bar rule.   Petitioner urges this Court to exercise its discretion to

address the final three issues raised in the instant Petition on their merits as an exception to the

exhaustion requirement of AEDPA.

### VI. Petitioner was denied his right to effective assistance of trial counsel pursuant to U.S. Constitution, Amd. VI in multiple ways during his trial, which in turn directly resulted in a denial of his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV.

An accused is guaranteed the right to counsel by the Sixth Amendment to the U.S.

Constitution.  Petitioner Clark asserts that this right was violated due to the ineffective assistance

provided by his trial counsel.  The trial court did not find that trial counsel provided ineffective

assistance of counsel during the hearing on Mr. Clark's motion for relief from judgment, without

granting the evidentiary hearing requested by the defense.[2] The findings of fact made by the trial

court in support of its denial of relief were clearly erroneous: they were based upon hypothetical

reasoning in reliance upon the trial transcripts that necessarily are devoid of any testimony from

trial defense counsel regarding what errors and omissions were conscious strategic decisions and

which were simply blatant errors and omissions.

The Court of Appeals erred in holding that, as to each issue raised, trial counsel's

performance did not fall below an objective standard of reasonableness and, for this reason,

appellate counsel was not ineffective for failing to raise each of these issues in Mr. Clark's

appeal of right.

### A.      Standard of Review:

Trial defense counsel is ineffective where counsel's errors made his performance fall

below an objective standard of reasonableness, where these errors did not constitute sound trial

strategy, and but for these errors, there exists a reasonable probability that the outcome of the

---

[2] Transcript of 09/09/11, pp 5-13.

trial would have been different.[3]  To establish a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the fact-finder would not have convicted the defendant.[4]

An accused asserting a claim that counsel was ineffective must show first that counsel's performance fell "below an objective standard of reasonableness . . . under prevailing professional norms."[5]  Second, defendant must show that the ineffective assistance prejudiced the defense.  There is a strong presumption that trial counsel was competent.  *Id.*

**B.     Trial counsel provided ineffective assistance to Mr. Clark.**  Petitioner Clark's trial counsel was ineffective in multiple ways.  Trial counsel's omissions, when viewed as a whole, deprived Clark of a meaningful defense and the due process of a trial that was a truth-finding process, contrary to the Sixth and Fourteenth Amendments.[6]

The right of an accused to receive effective assistance of trial counsel is established by the Sixth Amendment to the United States Constitution.  In *Strickland v Washington*, *supra*, the Supreme Court set forth the seminal test for determining whether or not trial counsel was effective.  Ineffective assistance of counsel is shown where:

1. Counsel provided representation that was deficient enough to be below an objective standard of reasonableness, and that counsel's error's were so serious

---

[3] Strickland v Washington, 466 U.S. 668,104 S.Ct 2052, 80 LEd2d 674 (1984).
[4] People v Pickens, 446 Mich. 298, 312, 521 N.W.2d 797 (1994), *citing:* Strickland v Washington, *supra*.
[5] Meeks v Bergen, 749 F.2d 322, 327 (6th Cir. 1984), *citing*: Strickland v Washington, *supra*.
[6] Strickland v Washington, *supra*; United States v Cronic, 466 U.S. 648, 658-59, 104 S.Ct. 2039, 80 LEd2d 657 (1984); Groseclose v Bell, 130 F. 3d 1161, 1164-1168 (6th Cir. 1997); *and compare*: Moss v Hofbauer, 286 F 3d 851 (6th Cir. 2001) (Clay, J. *dissenting*); US Const., VI, XIV.

that he or she was not functioning as the counsel guaranteed to the accused by the
Constitution;

2.   There was a reasonable probability that but for counsel's unprofessional errors,
the outcome of the trial would have been different.

*Id*. at 686.  The <u>Strickland</u> holding has been followed to date by Michigan courts.[7]  Petitioner

Clark asserts that his defense counsel provided him with ineffective assistance in three manners:

failure to object, failure to consult with and obtain an expert witnesses on eyewitness

identification, and failure to investigate missing witnesses in a timely manner.

(1)      ***Defense counsel was ineffective for failing to raise appropriate objections***

***during trial***:  Defense counsel failed to object to the two instances of prosecutorial vouching

cited and briefed *infra*.  While defense counsel did object during the prosecution's closing

argument the first time he argued facts not in evidence, the defense failed to object on the second

occasion.  This error was especially egregious because in both instances, the prosecutor was

asserting the same misleading facts that were not in evidence:

> There's been a lot of talk throughout this case about other things, gunshot residues
> and blood.  And if you remember the testimony of the medical examiner, it
> because important.  This individual was shot in the back.  Miss Jones didn't see
> that shot because her only shots that she's saying is when this person's on the
> ground.  Well, guess what?  ***That is totally contradictory to the medical evidence,***
> ***totally.  This person was shot in the back first ---***
>
> Mr. Burkett:  Judge I'm going to object to that because ----
>
> The Court:  Sustained.
>
> Mr. Burkett:  Well, may I finish?  And I hate to object in his closing but the
> medical reports admitted into evidence and the medical examiner states he didn't
> know when he was shot, he just numbered them this way.

*Emphasis added*, (Vol. IV at 190-191).  A second time, the prosecutor argued:

---

[7] <u>Pickens</u>, *supra*; <u>Martin v Mitchell,</u> 280 F.3d 594, 607 (6th Cir. 2002).

*I want you to remember the testimony of the medical examiner. I want you to remember how the first shot was in the back.* I want you to remember how the medical examiner told you when people are hot like this, the body can fill up with blood.  That's how he died, that's what the medical examiner testified."

*Emphasis added,* (Vol. IV at 197, lines 12-17).  The defense objected on the first occasion, but not on the second occasion.  (Vol. IV at 191, 12-17).  This resulted in the error being only partially preserved for proper State appellate review.

The Court of Appeals erroneously held that this failure to object may have been trial strategy in refraining from objecting during the prosecutor's closing argument. (**Exhibit D**: Slip Op at 6).  It is unfathomable that such an error could have been a conscious choice of trial strategy: defense counsel was already on notice that the prosecutor had attempted to use this inaccurate version of the facts once before to improperly attempt to cure a defect in the testimony of its lay witness, had caught it, and had properly objected the first time.  Had defense counsel been paying attention during closing argument, he should have caught this second attempt by the prosecutor to mislead the jury into thinking that the autopsy evidence did not contradict the story told by his key eyewitness.  Even though the jury is instructed that closing arguments are not evidence, the intentional misrepresentation of evidence by the prosecutor which came in through a professional expert like the medical examiner immediately prior to the jury deliberating will necessarily have an impact on the jury's interpretation of what it perceives as the actual evidence introduced during trial.

This was not sound trial strategy, particularly when defense counsel demonstrated that he realized the prosecution was trying to use facts not in evidence on the same exact issue to improperly sway the jury just minutes beforehand.  The error was prejudicial to Mr. Clark, as it directly affected the preservation of the error for appellate review.  Finally, given the other cited

37

errors occurring during this trial, it is probable that the absence of this error could have produced a different result at trial.

(2)   *Defense trial counsel was ineffective by failing to consult with and to obtain an expert witnesses on eyewitness identification testimony*:  The key issue in this trial was the false eyewitness identification of Mr. Clark as the shooter of Mr. Marshall.  Only witness Terrance Jones positively identified Mr. Clark: the other eyewitnesses gave physical descriptions of the shooter that were significantly different than Mr. Clark.  Mr. Clark asserts that if defense counsel had consulted with an expert on eyewitness identification, had timely sought permission of the Court to use an expert witness to testify for the defense at trial, and had called said witness for his defense, it is highly probable that the outcome of this trial would have been different.

The Court of Appeals held that failure to call an expert witness regarding the inaccuracies of eyewitness identification testimony was not ineffective, and was a matter of trial strategy. (**Exhibit D**: Slip Op at 7). The panel reasoned that had the defense called such an expert witness, it may have undermined the fact that two of the three prosecution eyewitnesses did not identify Mr. Clark, and testified that the shooter looked significantly different than Mr. Clark.  This circular reasoning should not be adopted by this Court on review:  an objectively reasonable defense counsel would have necessarily chosen to attack the credibility of the lone eyewitness that accused Mr. Clark of the shooting.

In order to rebut the presumption that failure to call a witness is a matter of trial strategy, a defendant must show that an objectively reasonable lawyer would have called the witness and,

if the witness had been called, the outcome of the trial likely would have been different.[8]  Expert

testimony is admissible if:

> the court determines that scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training, or
> education may testify thereto in the form of an opinion or otherwise if (1) the
> testimony is based on sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.[9]

Michigan Courts have long recognized the unreliability of eyewitness identification, and

expert testimony regarding eyewitness identification has been admitted as scientific evidence

pursuant to the requirements of Daubert v Merrill Dow Pharmaceuticals.[10]  In the seminal case of

People v Anderson,[11] the Michigan Court of Appeals analyzed the complexity of challenges to

eyewitness identification testimony.  The Anderson Court noted four factors must be considered

when challenging eyewitness testimony and the circumstances surrounding eyewitness

identifications:

> The psycho-legal fundamentals in this case derive from the tension between four
> factors involved in eyewitness identification in criminal cases. The four factors
> are:
>
> 1. The natural and usually necessary reliance on eyewitness identification of
> defendants by the police and prosecution;
>
> 2. The scientifically and judicially recognized fact that there are serious
> limitations on the reliability of eyewitness identification of defendants;

---

[8] People v Johnson, 451 Mich 115, 122-124; 545 NW2d 637 (1996).
[9] MRE 702
[10] 509 US 137, 119 S Ct 1167, 143 L Ed 2d 238 (1999); People v Unger, 278 Mich App 210, 749
NW2d 272 (2008).
[11] 389 Mich 155, 205 NW2d 461 (1973).

3. The scientifically and judicially recognized fact that frequently employed police and prosecution procedures often (and frequently unintentionally) mislead eyewitnesses into misidentification of the defendant;

4. The historical and legal fact that a significant number of innocent people have been convicted of crimes they did not commit and the real criminal was left at large.[12]

As cautioned by the United States Supreme Court in United States v Wade[13]:  "The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." Wade, 228.

Defense counsel knew that the defense strategy at trial was to challenge the accuracy and credibility of eyewitness Terrance Jones' identification of Mr. Clark as the shooter:  Terrence Jones was the only person at the scene who identified Mr. Clark.  Defense counsel also knew that Mr. Clark had an alibi for that night, as well as the fact that there were several other witnesses to the shooting whose description of the shooter and incident contradicted that of Terrence Jones. As observed by the Anderson court in its opinion (and Appendix thereto), there exist numerous studies, learned treatises, as well as real case examples, proving the unreliability of eyewitness identification testimony.  Defense counsel in this case did not even consult with any potential expert witnesses regarding a scientific-based challenge to the unreliability of eyewitness testimony.  Had defense counsel even consulted with such an expert, he could have better framed his cross-examination of the prosecutor's only witness who identified Mr. Clark, as well as strengthened his examination of the additional eyewitnesses who testified about a shooter that did not match Mr. Clark's description.

---

[12] Anderson, 389 Mich at 174.
[13] 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967),

It was not sound trial strategy in this case, where the only true issue was the identity of

the shooter and where the main defense was to challenge the accuracy of Terrence Jones'

eyewitness identification, for defense counsel to fail to consult with and to call an expert witness

regarding the unreliability of eyewitness identification testimony.  Had defense counsel

consulted with a potential expert witness early in the preparation of the defense of this case,

timely notified the Court and prosecution of his intended use of the expert, and had defense

counsel called such an expert to testify for the defense at trial, it is highly probable that the

outcome of Mr. Clark's trial would have been different.

(3)     *Defense trial counsel was ineffective for failing to investigate missing witnesses*

*in a timely manner*:   It was obvious from both the Court's comments regarding witness Jerel

Dillard's failure to appear to testify for the defense,[14] as well as defense counsel's examination of

those witnesses who did testify that confirmed the presence of witness Kevin Long at the scene,

that both witnesses were important to the defense strategy in this case and that both did not

appear.  The Court of Appeals held that trial counsel's actions were not ineffective, as Mr.

Dillard had appeared for the first day of trial and for this reason trial counsel "had no reason to

anticipate that Dillard would not be present during the remainder of the trial." (**Exhibit D**, Slip

Op at 8).  The panel asserted that trial counsel's "improvisation" by arguing in closing that Mr.

Dillard may have had a motive to shoot the victim somehow relieved him of the possibility that

his actions could have been ineffective and/or prejudicial to Mr. Clark.

As set forth *supra*, Mr. Dillard and Mr. Long asserted post-trial that each of them had

been intimidated by the police, specifically, the officer in charge of the case Inkster Police

---

[14] Tr. Vol. IV 11-08-05 at 100, lines 18-22.

Department Detective DelGreco. Detective DelGreco had told each witness that, in essence, if either one testified for the defense in Mr. Clark's case, that he would make sure they would be charged and convicted of the murder of Mr. Marshall as well. (**Exhibits H, I, J, K**). Trial defense counsel knew about the police intimidation of Mr. Long at the Preliminary Examination, as it was brought to the Court's attention at that time. (PE Tr. 07-12-05 at 121-125). The fact that Mr. Dillard had been intimidated by Detective DelGreco in the same manner during the course of Mr. Clark's trial, however, did not come to light until 2008, when an investigator hired by Mr. Clark's family interviewed him and obtained a written Affidavit.

Had trial defense counsel sent an investigator, or even had he attempted himself, to ask Mr. Dillard and Mr. Long why they had not appeared to testify while the trial was still pending, defense counsel could have apprised the Court of the police witness intimidation much sooner. This would have enabled the trial court to address the allegations in a more timely manner and may have resulted in one or both of the missing defense witnesses ultimately being convinced to testify before the trial had ended.

Defense counsel's failure to at least try and talk to Mr. Dillard and Mr. Long regarding their reason for not coming to testify at trial was not sound trial strategy. Defense counsel knew, or should have known, by the time trial was underway that the testimony of Mr. Long, another eyewitness to the shooting, was critical for the defense. Two of the other witnesses confirmed that Mr. Long also saw the shooting through their trial testimony.[15] Defense counsel knew or should have known what the substance of Mr. Long's testimony would be, as Mr. Long originally had appeared at the Preliminary Examination to testify for the defense but, following

---

[15] *Terrence Jones*: Tr. Vol. II at 70-71; *Kimberly Jones*: Tr. Vol. II at 141-142.

intimidation by Officer DelGreco in the parking lot, and following a short discussion with Judge James, Mr. Long left and did not testify.  (PE Tr. 07-12-05 at 121-125).

While the Preliminary Examination testimony of Mr. Dillard was read to the jury during trial, Mr. Long's potential testimony had never been preserved and was not presented at trial. Mr. Long's testimony was not merely cumulative nor merely impeachment testimony: it was crucial eyewitness testimony that gave a much more detailed physical description of the actual shooter. The physical description given by Mr. Long [that the shooter was about 6'2" or 6'3", had a "thick" athletic build body, and had a light black complexion] does not match the physical characteristics of Mr. Clark, who is average height, thin, and darker complected.  From the record, it does not appear that defense counsel even sought the Court's assistance in compelling Mr. Long to appear and to testify for the defense at trial.  This cannot be considered sound trial strategy by any stretch of the imagination.

Identification of the shooter was the key issue in Mr. Clark's trial.  Mr. Long's testimony, which should have been known to defense counsel prior to trial, provided an eyewitness description of the shooter that contradicted Terrence Jones' claim that Mr. Clark was the shooter. The jury deliberated for four days following a five-day long trial.  They indicated twice that they were "hung" and could not reach a unanimous verdict during their deliberations.  They requested the ability to review transcripts of two of the eyewitnesses who testified and contradicted each other: Terrence Jones and Kimberly Jones.  Since there was absolutely no physical evidence linking Mr. Clark to this crime, any eyewitness testimony that challenged the prosecution's reliance on Terrence Jones was critical to the defense.  Had Mr. Long been produced by the

defense to testify at trial, and had the jury been presented with Mr. Long's testimony, it is probable that the outcome of Mr. Clark's trial would have been different.

**C.**      **These actions and inactions by defense trial counsel cannot be characterized as sound trial strategy**:  While each individually cited error of defense counsel constituted ineffective assistance in and of themselves, the combination of the three cited errors had a devastating effect on the defense of Mr. Clark.  The key to the defense strategy was to show that witness Terrence Jones wrongly identified Mr. Clark as the shooter.  Any and all evidence that tended to prove that theory necessarily should have been produced during trial.

The combination of defense counsel's failure to object when the prosecution argued facts that were not in evidence by mischaracterizing the testimony of the medical examiner, failure to consult with and/or call an expert witness regarding the unreliability of eyewitness identification testimony, and his failure to investigate or otherwise adequately react to the absence of two trial defense witnesses in a timely manner during the course of trial, cannot be considered sound trial strategy.

**D.**      **There is a reasonable probability that, but for defense trial counsel's errors, the outcome of Mr. Clark's trial would have been different**:  Mr. Clark testified at trial and asserted his actual innocence of the crimes of conviction.  He presented an alibi witness to corroborate his testimony, and two of the three eyewitnesses to the shooting that did testify gave a description of the shooter that did not match Mr. Clark.  The jury, during its four days of deliberation, indicated twice to the Court that it was hung and could not reach a unanimous verdict.  Given all of these facts, it is highly probable that the outcome of Mr. Clark's trial would have been much different but for the unprofessional errors of trial defense counsel

For all of the foregoing reasons, this Court should GRANT Petitioner's request for habeas corpus relief.

### VII.  Petitioner was denied his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV, when the Inkster Police Department engaged in misconduct by intimidating two known defense witnesses prior to and during trial, resulting in a miscarriage of justice.

Petitioner's trial defense was severely prejudiced when two witnesses failed to testify for the defense at trial due to intimidation by the Inkster Police Department.  While defense counsel attempted to remedy the non-appearance through his closing argument, the prejudice caused by the missing witnesses could not be cured.  While these arguments were raised by the defense at the hearing on the Motion for Relief from Judgment, the trial court did not make any specific findings of fact or conclusions of law on this issue.[16]

The Court of Appeals asserted that Mr. Dillard's testimony would have been irrelevant because Mr. Clark did not raise a self-defense argument at trial, and that Mr. Dillard's testimony only spoke to the propensity for violence of the victim. (**Exhibit D**: Slip Op at 8).  The panel further held that the failure to subpoena Mr. Long as a trial witness even after someone allegedly identified him as the shooter at the District Court, coupled with defense counsel's failure to secure Long's presence and testimony during trial was a matter of trial strategy.  (**Exhibit D**: Slip Op at 9-10).  The Court of Appeals panel summarized that these actions of defense counsel did not fall below an objective standard of reasonableness, and thus could not be ineffective assistance.

**Petitioner's Constitutional due process and fair trial rights were violated by police misconduct.**  The witness intimidation perpetrated by the police both prior to and during

---

[16] Transcript of 09/09/11 at 5-9.

Petitioner's trial effectively acted to suppress or to hide potentially exculpatory evidence that the prosecution had a duty to provide the accused pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. The Michigan appellate courts have routinely and strongly condemned prosecutorial intimidation of witnesses.[17]  Threats from law enforcement officers may be attributed to the prosecution.[18]  Where a testimonial record be developed to support a defendant's argument on the issue, remand for an evidentiary hearing has been ordered.[19]  The trial court transcript record lends credibility to Mr. Clark's assertions of police witness intimidation: the preliminary examination transcript shows that both Mr. Dillard and Mr. Long did appear to testify for the defense, but that Mr. Long, after a brief soliloquy with the District Court Judge, left and did not testify. (PE Tr. 07-12-05 at 121-125). Mr. Dillard did testify at the preliminary examination, and did appear pursuant to subpoena on the first day of trial, but did not appear on any subsequent day of trial and never testified at trial.

Prior to trial in the underlying case, Mr. Clark's family had canvassed the neighborhood and discovered an additional eye witnesses to the shooting of Mr. Marshall: Mr. Kevin Long, and another witness who knew the capacity of the victim for violence: Mr. Jerel Dillard.  They made defense counsel aware of those witnesses.  Counsel interviewed the witnesses prior to the preliminary examination, and intended on calling them to testify during Mr. Clark's trial.  Both witnesses appeared at the Preliminary Examination: Mr. Dillard testified, but Mr. Long left after disclosing to the Judge that he had been intimidated by a police officer in the parking lot for the District Court.  (PE Tr. 07-12-05 at 121-125, 142-152).  Both witnesses then failed to appear to

---

[17] People v Stacy, 193 Mich App 16, 484 NW2d 675 (1992), citing: People v Pena, 383 Mich 402; 175 NW2d 767 (1970); People v Crabtree, 87 Mich App 722; 276 NW2d 478 (1979).
[18] Stacy, 193 Mich App at 24; citing: People v Hooper, 157 Mich App 669, 675; 403 NW2d 605 (1987); People v Canter, 197 Mich App 550, 569-570; 496 NW2d 336 (1992).
[19] Stacy, Id; citing: People v Hooper, 422 Mich 875; 366 NW2d 6 (1985).

testify at trial.  Both witnesses revealed that they had been intimidated by the Officer in Charge

of the investigation: Inkster Police Department Detective Anthony DelGreco.

  Both Mr. Long and Mr. Dillard executed Affidavits in support of Mr. Clark's *pro se*

6.500 Motion, which were attached originally as *Appendices A and B* to the 6.500 motion.

(**Exhibits H & I**).  Subsequently, counsel for Mr. Clark re-interviewed each witness and

obtained more detailed statements under oath from each, which are attached as **Exhibits J & K**.

The trial Court never addressed the issue of police intimidation of defense trial witnesses on its

merits. At the very least, the trial Court should have granted an evidentiary hearing to create a

record on the issue, to examine the credibility of the witnesses, and to question Detective

DelGreco regarding the veracity of their allegations of intimidation.

  In his *pro se* 6.500 motion and supplement, Mr. Clark framed this issue two ways:  first,

that it was police misconduct that resulted in a miscarriage of justice and the conviction of an

innocent person; and second, that the misconduct should be attributed to the prosecution and

treated as a failure to disclose potentially exculpatory evidence pursuant to Brady v. Maryland,

373 U.S. 83 (1963), and its progeny. (*6.500 Motion supplementary brief*, arguments I and III).

Mr. Clark testified at trial as to his actual innocence, and his alibi witness testified to corroborate

his assertions.  Witness Dillard provided evidence of the character of the victim for violence.

Even though the prejudice from Mr. Dillard's absence at trial was lessened somewhat through

the reading of portions of the preliminary examination transcript to the jury at trial, it was less

persuasive than live testimony from the actual witness.  Probably of greater importance,

however, was the potential testimony of Mr. Long, who actually witnessed the shooting and

provided a more detailed physical description of the shooter that described a man whose physical

description was dramatically different than that of Mr. Clark.  Mr. Long's testimony can be characterized as being exculpatory in nature: he actually saw the shooter and witnessed the entire shooting and he gave a physical description of the shooter that could not match Mr. Clark.

The fact that this exculpatory evidence was, in actuality, suppressed by the actions of the police, an arm of the prosecution, was clearly prejudicial to Mr. Clark's defense of the charges against him.  The testimony of Mr. Long was not merely cumulative: it provided clear details about the shooting as it occurred, and it acted to directly impeach the only eye witness for the prosecution that actually claimed to have seen Mr. Clark as the shooter.  This was not a case where the prosecution produced evidence that was overwhelmingly convincing for the jury:  the jury was out four (4) days, and twice indicated to the trial court that it was hopelessly deadlocked during its deliberations.  It is highly probable that had Mr. Long and Mr. Dillard appeared to testify for the defense, the outcome of the trial would have been substantially different.  The trial court erred in failing to grant relief on this issue: it made no findings of fact nor ruling of law specific to this issue when denying the motion for relief from judgment.  At a minimum, the trial court should have granted an evidentiary hearing to expand the record prior to ruling on the merits of the motion.  It erred in failing to do so.

For all of these reasons, this Court should GRANT Petitioner's request for habeas corpus relief. In the alternative, this Court should GRANT Petitioner an evidentiary hearing to expand the record on the issues raised in this argument.

### VIII.  Petitioner was denied his rights to due process and a fair trial, pursuant to U.S. Constitution, Amds. V and XIV, due to additional deliberate, flagrant and prejudicial prosecutorial misconduct that seriously undermined the integrity and fairness of Petitioner's trial.

The evidence presented at trial against Petitioner was not overwhelming by any means. The prosecutor's misconduct during closing argument had a profound and prejudicial effect on how the jury perceived the evidence that had been presented immediately prior to deliberations. The trial court did not reach this issue during its ruling denying Petitioner's motion for relief from judgment, and made no findings of fact nor conclusions of law regarding the merits of this issue. The Court of Appeals almost conceded that this <u>was</u> improper vouching, but then held that defense counsel's decision not to object "may have been a strategic one," and justified finding that defense counsel was not ineffective for failing to object. (**Exhibit D**: Slip Op at 6). The panel did not address the underlying prejudice caused by the prosecutorial misconduct itself. This error was prejudicial to Petitioner, and it seriously undermined the integrity and fairness of his trial.

      **B.**      **The prosecutor committed flagrant misconduct during Petitioner's trial**: The duty of the prosecutor is much more than to win cases. He or she has an obligation to ensure a defendant has a fair trial.[20] The prosecutor represents the public interest and his object, "like that of the court, should be simply justice. He has no right to sacrifice this to any pride of professional success."[21] The prosecutor in this case failed in that obligation, and Petitioner Clark was denied a fair trial as a result.[22]

      In <u>Darden v Wainwright</u>, 477 U.S. 168 (1986), the Supreme Court set out the standard for reviewing claims of prosecutorial misconduct. For a Petitioner to prevail, he must show the prosecutorial misconduct was so egregious and pervasive that it infected the entire trial with

---

[20] <u>Berger v United States,</u> 295 US 78; 55 S Ct 629; 79 LEd2d 1314 (1935).
[21] *Hurd v People*, 25 Mich 405 (1872).
[22] US Const, Amd. XIV.

unfairness, depriving the accused of due process.[23]  In order to deny due process, the misconduct

must be "so pronounced and persistent that it permeates the entire atmosphere of the trial" or "so

gross as probably to prejudice the defendant."[24]   In evaluating charges of prosecutorial

misconduct, the court should look at whether the defense invited the error, the pervasiveness of

the misconduct, its egregiousness and deliberateness, and its weight when compared to the total

body of evidence produced at trial.[25]  The actions of the prosecutor during Mr. Clark's trial were

so outrageous and unprofessional that they permeated the trial in this case and deprived Mr.

Clark of his due process rights.

The Sixth Circuit stressed that the determination whether the trial was fundamentally

unfair should be "made by evaluating the totality of the circumstances surrounding each

individual case."[26]  The reviewing Court must focus on "the fairness of the trial, not the

culpability of the prosecutor."[27]  When assessing the prosecutor's conduct, the court must first

ask whether the prosecutor's conduct or remarks were improper.[28]  If they were, the court must

decide whether the improper acts were so flagrant as to warrant relief.[29]

In his 6.500 motion and supplement, Mr. Clark asserted that there were two forms of

prosecutorial misconduct: improper vouching for the credibility of the main prosecution witness,

---

[23] *Id.* at 181. *See also:* <u>Donnelly v DeChristoforo</u>, 416 US 637, 643; 94 S Ct 1868; 40 L Ed2d
431 (1974); <u>United States v. Ashworth</u>, 836 F.2d 260, 267 (6th Cir. 1987); <u>Bowling v. Parker</u>,
344 F.3d 487, 512 (6th Cir. 2003).
[24] <u>Pritchett v Pitcher</u>, 117 F3d 959, 964 (6th Cir. 1997).
[25] <u>Darden</u>, 477 U.S. at 181-83.
[26] <u>Anger v Overberg</u>, 682 F.2d 605, 608 (6th Cir. 1982).
[27] <u>Pritchett v Pitcher</u>, 117 F.3d 959, 964 (6th Cir. 1997), *citing*: <u>Serra v Michigan Department of
Corrections,</u> 4 F.3d 1348, 1355 (6th Cir. 1993).
[28] <u>Slagle v  Bagley</u>, 457 F.3d 501, 515-16 (6th Cir. 2006).
[29] *Id.* at 516.

Terrence Jones; and also improperly repeatedly arguing misleading facts not in evidence during

closing argument.

>    **(1)**     ***The prosecutor engaged in improper vouching during Petitioner's trial***:  A

prosecutor cannot vouch for the credibility of its witnesses by improperly implying that he or she

has some sort of special knowledge of their truthfulness. [30]  In closing arguments in Mr. Clark's

case, the prosecutor summarized the testimony of Terrence Jones as follows:

> . . .but the key in this case and the thing that's going to eat at Mr. Burkett
> throughout this whole case as he represents Mr. Clark is the fact that we have an
> eyewitness.  So, when you evaluate the testimony of the eyewitness, Terence
> Jones, you have to evaluate his testimony and evaluate his credibility.
>
> ***Mr. Jones never wavered throughout the testimony in this case***.
>
> Terence Jones knows him by sight, has seen him 25 to 35 times, I believe the
> testimony indicated, and knows who he is and sees Greg Marshall get in the car.

(Tr. Vol IV at 187-188).  In speaking about Officer in Charge DelGreco, the prosecutor asserted:

> Delgreco then proceeds to take the statement from the defendant, which, of
> course, you have to evaluate the credibility and then look at the fact that Delgreco
> made all these details up, made up all the statements, because you know what?
> ***He's a better – great man because I'll tell you what he should have put in that
> statement***: "I did it, me and my gun that I threw in the river, that's what he should
> have said.  ***But he doesn't because what he's trying to do is lock out any alibi,
> lock it out***, find out where that car was, find out where Miss Hunter was, find out
> where Mr. Clark was, and that's what he did.

(Vol IV at 196-197).  Mr. Clark asserts that in both of the above-cited instances, the prosecutor

was improperly trying to bolster the credibility of his witnesses by using arguments that implied

he had personal knowledge of each witnesses' truthfulness.  The comments were not objected to

in either instance by defense counsel, and thus were not properly preserved for appellate review

---

[30] *People v. Bahoda,* 448 Mich. 261, 281, 531 N.W.2d 659 (1995).

unless plain error occurred.  Petitioner asserts that the misconduct was so egregious that it did

constitute plain error.

      Mr. Clark urges this Court to review his assertion of improper vouching on its merits and

find that the misconduct constitutes plain error requiring that habeas corpus relief be granted.[31]

Plain error is error which is clear or obvious.[32] The error must meet the following requirements

to require the reversal of a conviction:

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain
> error affected substantial rights.  *Citations omitted.* The third requirement generally
> requires a showing of prejudice, i.e., that the error affected the outcome of the lower
> court proceedings.  *Citations omitted.*  "It is the defendant rather than the Government
> who bears the burden of persuasion with respect to prejudice."  *Citations omitted.*
> Finally, once a defendant satisfies these three requirements, an appellate court must
> exercise its discretion in deciding whether to reverse.  Reversal is warranted only when
> the plain, forfeited error resulted in the conviction of an actually innocent defendant or
> when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial
> proceedings' independent of the defendant's innocence."  *Citations omitted.*[33]

Mr. Clark asserts that all three prongs of the test are met by the cited instances of prosecutorial

misconduct in his case.  First, the comments by the prosecution in closing argument were

improper vouching, and thus constitute an error.  Second, the error was clear or obvious, and

should have been recognized by defense counsel when it occurred.  Third, the error did affect the

substantial rights of Mr. Clark, as it aided in resulting in his conviction.  Mr. Clark asserts that

the error did result in the conviction of an innocent man: he has adamantly proclaimed his

innocence of the crimes against him throughout the pendency of his case, and testified in his own

---

[31] People v Carines, 460 Mich 750, 597 NW2d 130 (1999); United States v Jones, 108 F.3d 668,
670 (6th Cir. 1997) (*en banc*).
[32] Jones, *supra*, at 671.
[33] Carines, *supra*, at 763-764; *Citing*: People v Grant, 445 Mich 535, 520 NW2d 123 (1994);
United States v Olano, 507 US 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Johnson v United
States, 520 US 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

defense at trial.  Failure to vacate Mr. Clark's convictions would result in a miscarriage of justice

in the instant case.

      **(2)**     ***The prosecutor argued facts not in evidence during closing argument at***

***Petitioner's trial***:  A prosecutor cannot argue facts not in evidence or mischaracterizations of

evidence presented during closing argument.  A prosecutor may only argue reasonable inferences

from the actual evidence presented and admitted during trial.[34] The Court of Appeals only

addressed this issue from the standpoint of holding there was no ineffective assistance of trial

counsel for failing to object, and did not address the merits of the prosecutorial misconduct issue

itself.

      At Mr. Clark's trial, Medical Examiner John Scott Somerset testified about the autopsy of

Gregory Marshall.  His testimony was clear:

> Q.     Okay. If you could please, going into gunshot wound – or the separate
> wounds that you noted on your external examination, can you tell me something
> about gunshot wound number one please?
>
> A.     Yes, I can.  These wounds, I numbered them just for descriptive purposes.
> Gunshot wound number one does not mean it was the first one.  I don't know
> what order these were --- these occurred.  So gunshot wound number one, I
> arbitrarily labeled gunshot wound number one was on the left back. . . .
>
> . . . .
> Q.     So the individual that you examined, that being Mr. Marshall, was shot in
> the back?
>
> A.     Yes, once.

---

[34] <u>Bahoda</u>, *supra* at 282, 531 N.W.2d 659; <u>People v Fisher</u>, 220 Mich.App. 133, 156, 559
N.W.2d 318 (1996).

(Vol. I. 11-03-05 at 171, lines 7-16; to page 72, lines 4-7).  In closing argument, however, the

prosecutor repeatedly argued facts not in evidence when referring to the medical examiner's

testimony:

> There's been a lot of talk throughout this case about other things, gunshot residues
> and blood.  And if you remember the testimony of the medical examiner, it
> because important.  This individual was shot in the back.  Miss Jones didn't see
> that shot because her only shots that she's saying is when this person's on the
> ground.  Well, guess what?  ***That is totally contradictory to the medical evidence,
> totally.  This person was shot in the back first ---***
>
> Mr. Burkett:  Judge I'm going to object to that because ----
>
> The Court:  Sustained.
>
> Mr. Burkett:  Well, may I finish?  And I hate to object in his closing but the
> medical reports admitted into evidence and the medical examiner states he didn't
> know when he was shot, he just numbered them this way.

*Emphasis added*, (Vol. IV at 190-191).  A second time, the prosecutor argued:

> I want you to remember the testimony of the medical examiner.  ***I want you to
> remember how the first shot was in the back.***  I want you to remember how the
> medical examiner told you when people are hot like this, the body can fill up with
> blood.  That's how he died, that's what the medical examiner testified."

*Emphasis added,* (Vol. IV at 197, lines 12-17).  The defense objected on the first occasion, but

not on the second occasion.  (Vol. IV at 191, 12-17).

Mr. Clark asserts that the prosecutor intentionally attempted to mislead the jury by

arguing not once, but twice, that the Medical Examiner testified that the shooter shot the victim

first in the back.  This was wrong, and definitely was not what the Medical Examiner testified.

While a lay prosecution witness did claim that Mr. Marshall was shot first in the back, that

witness was not the Medical Examiner.  By trying to convince the jury that it was indeed the

Medical Examiner, with his specialized scientific knowledge, that testified Mr. Marshall was

shot first in the back, the prosecution not only improperly argued facts not in evidence, but also improperly attempted to bolster his theory of the case by putting the prestige of the Medical Examiner's office behind the "facts" that he wanted the jury to believe.

C.      **The prosecutor's misconduct permeated and directly affected the fairness of Petitioner's trial**: The entire trial hinged on whether the jury believed the testimony of witness Terrence Jones. The prosecutor's misconduct, although confined to closing argument, was flagrant. The prosecutor's intent in committing the misconduct clearly was to shore up the weaknesses in its case. The defense did not invite any of the instances of misconduct. The statements, particularly the two back-to-back incidents of arguing facts not in evidence, were made deliberately by the prosecutor. As there was no physical evidence that tied Mr. Clark to the charged crimes, and since eyewitnesses Kimberly Jones and Lucresha Baker both contradicted Terrence Jones' version of the shooting, the improper statements by the prosecutor throughout his closing argument were very prejudicial to Mr. Clark's defense. The jury was not easily convinced: they deliberated four days and informed the judge twice that they could not reach a unanimous verdict. Without the prosecutorial misconduct, it is highly likely that the outcome of Mr. Clark's trial would have been different.

The multiple incidents of prosecutorial misconduct present during Petitioner Clark's trial were profound and resulted in a trial that was fundamentally unfair. For these reasons, this Court should grant habeas corpus relief.

## CONCLUSION AND REQUEST FOR RELIEF

For all of the foregoing reasons contained within his Amended Petition and Amended

Brief in Support, Petitioner ALPHONSO MITCHELL CLARK, #506485, respectfully prays that

this Honorable Court GRANT any and all relief sought in the instant Petition.

Respectfully submitted,

*/s/ David S. Steingold*
LAW OFFICES OF DAVID S. STEINGOLD
BY: DAVID S. STEINGOLD (P 29752)
400 Monroe Street, Ste. 280
Detroit, MI 48226
(313) 962-0000  (voice)
(313) 962-0766  (fax)
detroitdefender@yahoo.com


**DATED:  April 16, 2014**

## CERTIFICATE OF SERVICE

DAVID S. STEINGOLD (P 29752) states that on **April 16, 2014** he filed the

above-annexed pleading with the United States District Court for the Eastern District of

Michigan using the CM/ECF electronic filing system, and served a true copy thereof by

mail on the following:

> OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN
> 300 S. Washington, Ste. 530
> Lansing, MI 48913

Respectfully submitted,

*/s/ David S. Steingold*
LAW OFFICES OF DAVID S. STEINGOLD
BY: DAVID S. STEINGOLD (P 29752)
400 Monroe Street, Ste. 280
Detroit, MI 48226
(313) 962-0000  (voice)
(313) 962-0766  (fax)
detroitdefender@yahoo.com